IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| ALLEN F. CALTON | § | |
| VS. | § | CIVIL ACTION NO. 1:17-cv-239 |
| PINKEE PATEL, ET AL | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Allen F. Calton, an inmate confined within the Texas Department of Criminal Justice ("TDCJ"), proceeding *pro se*, brings this civil rights action pursuant to 42 U.S.C. § 1983 against several Defendants. Plaintiff asserts a claim of deliberate indifference to serious medical needs regarding his dental care. This matter was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636 for findings of fact, conclusions of law, and recommendations for the disposition of the case.

The court previously entered an Order (doc. #50) directing prison officials to prepare an administrative record in accordance with *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1987). The Office of Attorney General, as *amicus curiae*, filed a report (the "*Martinez* Report") in compliance with the Order (doc. #56). The court then entered an Order (doc. #73.) informing the parties the *Martinez* Report was being converted into a Motion for Summary Judgment. Plaintiff was allowed time to respond to the *Martinez* Report and has filed a Response (doc. #93).

### Factual Allegations

In his First Amended Complaint (doc. #21), Plaintiff alleges that in April, 2015, he was charged a $100 copay for an alleged patient-initiated dental visit. At this time, Dr. Shynett diagnosed him as having severe gum disease and suggested that he needed to be put in the periodontal disease program.

Plaintiff was subsequently enrolled in the program in order to receive treatment to decrease his pain and save several teeth. Several months later, he received an initial cleaning that removed

tartar on his teeth, which was the first step in the program. Several months after that, he received a more thorough teeth cleaning, which was the second step in the program.

On June 30, 2016, Plaintiff received full mouth x-rays and periodontal disease charting by a hygienist, the next step in the program. He states the x-rays and charting were necessary for the dentist at his unit to be able to make an official diagnosis as to the severity of his periodontal disease. A diagnosis is a necessary gateway to receiving a scaling and deep cleaning of the roots of the teeth, which Plaintiff says is the most effective process for treating periodontal disease and preventing further bone loss.

Plaintiff alleges that soon after receiving the initial cleaning, he began to complain about his pain and ongoing infection. He wrote to Defendant Pinkee Patel concerning the matter. On April 2, 2016, he received a response from Defendant Donald Eckersley, a dentist, stating his discomfort was caused by periodontal disease and that he was in the periodontal program. Plaintiff was told the next step would be x-rays and mouth charting, that he was in line to be seen by the hygienist and that the procedure would be scheduled when it was his turn.

On April 6, Plaintiff filed a Step 1 grievance concerning the delay he was experiencing. He received a response stating that since he filed the grievance he had been seen multiple times in the dental department, which had assessed his care needs.

On April 15, as a direct result of the pain he was experiencing, Plaintiff submitted a dental care request. The request stated he was experiencing severe pain in several teeth. He stated he could not take the pain any longer and asked for teeth to be extracted. Plaintiff assrts he submitted a similar request on April 18 which also stated he could not sleep at night.

Plaintiff submitted another dental care request on June 3. The request said he had three teeth that were causing him so much pain it felt like his head was about to explode. Plaintiff stated he could not sleep or chew and again asked that the teeth be extracted.

Plaintiff states he was examined by Defendant Tucker, a dentist, on June 6. Defendant Tucker told him he had a very severe case of periodontal disease. Plaintiff alleges he told him he

could not sleep at night because of the severe pain. However, Defendant Tucker did not recommend that Plaintiff be moved up on the waiting list. He told Plaintiff that making a diagnosis and receiving treatment for this problem was a very slow process.

On June 14, Plaintiff wrote the dental department. He stated that he had just had two teeth on the right side pulled and had several more teeth on the left side causing severe pain. Plaintiff stated he could not get these teeth pulled because he would then be unable to chew food. He requested priority and expedited treatment. Plaintiff received a response on June 16 stating that he had been seen "on time sequence" for his dental care. He was told he had a diagnostic appointment scheduled and that a sick call request would be filed concerning his pain.

Plaintiff states he submitted another request on July 15. He stated he was experiencing severe pain in two teeth and that they needed to be removed. A tooth was subsequently extracted. On May 3, 2017, a second tooth was extracted after Plaintiff filed an additional request.

On October 25, 2017, Plaintiff filed a request asking when he would receive the scaling and deep cleaning of the roots of his teeth, which he had been waiting for since June 30, 2016. He was told he was scheduled for an appointment. Plaintiff subsequently complained about the pain he was having chewing and requested dentures.

Plaintiff saw Defendant Jerry Wong, a dentist, on November 17. Defendant Wong asked plaintiff which tooth was causing the most pain. Plaintiff stated they were all hurting the same. Defendant Wong then tapped on each of Plaintiff's teeth with a dental tool. Plaintiff states he would cringe and wince when Defendant Wong tapped each tooth.

Plaintiff told Defendant Wong that since he had been waiting so long for treatment under the periodontal program, his remaining 16 teeth had deteriorated to the extent they were causing severe pain. He stated that due to the pain, the teeth needed to be extracted and he needed a full set of dentures. Plaintiff alleges Defendant Wong told him dentures were not provided to prisoners because of the cost. Defendant Wong offered to extract one tooth. Plaintiff states he declined the offer as it involved one of the four remaining teeth he was using to chew. He states he was also told

on November 17, that since so much time had passed since his teeth had been x-rayed and charted, this needed to be done again.

In a Supplemental Pleading (doc. #40), Plaintiff alleges that on April 9, 2018, Defendant Tucker determined that he should not receive a scaling and deep planing of the roots. He states Defendant Tucker told him that the procedure might no longer be worth the cost and might not do any good because of the progression of his periodontal disease.

Plaintiff states that as a result of the delay he experienced and the severe pain he was in, six teeth had to be extracted. He states they could have been saved if he had received prompt treatment. Plaintiff asserts he continued to experience severe pain in four teeth.

### The *Martinez* Report

The *Martinez* Report includes an affidavit from Billy Horton, a dentist. Dr. Horton states, in part, as follows:

> The dental inprocessing examination form indicates [that] when Mr. Calton entered TDCJ in August 2005, he was missing seven teeth and was diagnosed with periodontal disease-type 3. Periodontal Disease-Type 3 is defined as moderate chronic periodontitis with pocket depths or attachment loss of 5-6 mm, bleeding on probing, bone loss of 33%, mobility grade I and II, grade 1 or 2 furcation involvement (extension of the disease into the areas where the roots of the teeth diverge) and visual inflamation.
>
> On December 3, 2014, Mr. Carlton was transferred to TDCJ's Stiles Unit.
>
> On April 15, 2015, Mr. Calton was evaluated by Dr. Shynett for a sick call request for complaints that his tooth had become infected and painful. The dentist noted that the palatal root was exposed on tooth #14 (upper left first molar) with much calculus, that the patient had heavy calculus, gingiva inflammation, and severe bone loss. He was referred for extraction of tooth #14 and any other maxillary tooth deemed non-restorable.
>
> On September 10, 2015, tooth #14 was removed due to advanced periodontitis.
>
> On October 20, 2015, a comprehensive dental exam was performed by Dr. Shynett. The record notes Mr. Calton was missing nine teeth and had defects and mobility in three other teeth. He was assessed as having periodontal disease-type 4. As noted in Exhibit 2, type 4 periodontal disease is defined as severe chronic periodontitis with probing depths greater than or equal to 6, bleeding on probing, bone loss greater than 33%, mobility grade I, II and III, grade 1, 2, 3, or 4 furcation involvement (extension of the disease into the areas where the roots of the teeth diverge) and visual inflamation. Mr. Calton was scheduled for a gross scale. A gross scale is the

full mouth debridement of calculus and is generally prescribed when the patient has a large amount of supra and/or subgingival calculus on the teeth.

On October 30, 2015, Mr. Calton was seen by Carla Derouen. A full mouth debridement and fluoride application were performed per dentist orders.

On November 20, 2015, he was evaluated by a unit dentist for sensitivity when brushing on tooth #2 (upper right second molar). Sensitivity to brushing or cold is typical in patients that recently had a large amount of calculus removed. Calculus acts as an insulator and when it is removed the exposed root surfaces will often become sensitive. The plan was to extract tooth #2 as needed.

On November 24, 2015, Mr. Calton refused a sick call exam to evaluate his complaint of pain in his tooth and back of throat.

On January 14, 2016, tooth #2 was extracted due to advanced bone loss.

On January 26, 2016, Mr. Calton was evaluated by Dr. Jess Tucker for the first time due to the patient's concern about the site where tooth #2 was removed. Dr. Tucker examined the patient and reviewed radiographs taken that day and determined the site was healing nicely. Dr. Tucker assessed the patient with periodontal disease type IV and noted that Gross scale (cleaning) had been performed on October 30, 2015. Dr. Tucker informed the patient of his findings and instructed him to let someone know if anything changes for the worse.

On March 22, 2016, Mr. Calton had his teeth cleaned and a fluoride application by Carla Derouen per dentist orders. Periodontal Screening and Recording (PSR)[1] indicated codes of 3 in 4 sextants, code of 4 in one sextant and code of 1 in one sextant.

On March 23, 2016, Mr. Calton failed to report to dental for an appointment.

On April 19, 2016, tooth #5 was extracted due to a failed root canal. The plan was for the patient to return to the clinic for radiographs and charting.

On June 7, 2016, Mr. Calton was examined due to complaints of teeth pain. Dr. Ross noted that teeth #6, 7, 8, and 9 (upper interior teeth) had severe periodontitis. Probing depths up to 6 mm and moderate to severe teeth mobility. Tooth #6 was extracted.

On June 13, 2016, Dr. Ross saw Mr. Calton per a sick call request for tooth pain. Tooth #28 (lower right first premolar) was extracted due to 6 mm recession and attachment loss.

On June 16, 2016, Dr. Tucker saw Mr. Calton for a sick call request. The patient was advised that he was scheduled for full mouth radiographs and periodontal

---

[1] Periodontal Screening and reporting is a diagnostic aid used to assess the gingival health of patients. This method divides the mouth into sextants and measures if bleeding occurs, the amount of calculus and the probing depth. A special PSR probe is used to check six sites in each sextant and the worst finding determines the code. The codes range from 0-4, with 0 being no bleeding, calculus, or probing depths and 4 being the worse.

> examination. Dr. Tucker noted the patient's history of periodontal disease, noted no significant infection and informed him that he would be getting a lay-in in the morning. On June 17, 2016, Mr. Calton was a no show for his dental appointment.
>
> On June 30, 2016, Mr. Calton was seen by a dental hygienist for full mouth periodontal charting and x-rays of remaining dentition by dental hygienist. Dr. Ross also reviewed the chart and developed a periodontal treatment plan to include scaling and root planing of the teeth in each quadrant.
>
> On July 6, 2016, tooth #12 was extracted due to an endodontic lesion and moderate periodontitis by Dr. Ross.
>
> On May 3, 2017, Mr. Calton saw Dr. Wong for the first time for a sick call request for complaints that he had several teeth [that] were causing him pain. The record notes the patient indicated he wanted to start getting them pulled because the pain had become unbearable. Tooth #7 was extracted due to severe bone loss.
>
> On November 17, 2017, Mr. Calton was evaluated by Dr. Wong for pain in teeth #17 and 18 (lower left molars). There was no cause of pain identified–with possible clenching of the teeth noted as a cause. The patient was rescheduled for periodontal charting. The patient was informed he was scheduled for periodontal charting and that teeth #17 and 18 would be reevaluated as needed.
>
> On November 22, 2017, Mr. Calton refused to come to dental for an evaluation.
>
> On January 3, 2018, full mouth periodontal probing/charting was performed by Carla Derouen. Dr. Wong also examined Mr. Calton that day and developed a periodontal treatment plan that included scaling and root planing as well as a reevaluation of teeth #11, 15, 18, and 21. This was the last encounter Mr. Calton had with Dr. Jerry Wong.
>
> On April 9, 2018, Mr. Calton was scheduled for scaling and root planing but was evaluated by Dr. Tucker due to complaints of pain in the upper teeth. Dr. Tucker diagnosed that scaling and root planing were not indicated on the upper arch, and that teeth #8, 9, 11, 15, and 16 required extraction due to non-recoverable periodontal disease and infection. Mr. Calton refused extraction of teeth #8, 9, 11, 15 and 16. This is the last encounter Mr. Calton had with Dr. Jess Tucker.
>
> From the dental records I have reviewed, which did not contain radiographs, I surmise Mr. Calton's current dental plan consists of severe to hopeless periodontal disease of his remaining upper teeth which will require extraction. His lower posterior teeth have moderate to severe periodontal disease.

(Doc. #56-2, pp. 3-8.). Dr. Horton states Ms. Derouen, Dr. Wong and Dr. Tucker provided treatment as any prudent dental professional would have in the same circumstances and that their treatment met or exceeded the standard of care.

An affidavit from Defendant Manuel Hirsch was also included as part of the *Martinez* Report. Defendant Hirsch, who is the Director of Dental Services for TDCJ, states, in part, as follows:

> A review of the Electronic Health Record (EHR) of Mr. Calton revealed that Mr. Calton possessed a Provisional Periodontal Type 3 at his In-Take Exam on August 1, 2005, *i.e.*, Mr. Calton came into TDCJ with Type 3 periodontal disease. In a review of Mr. Calton periodontal treatment on October 27, 2009, the disease had progressed to Definitive Periodontal Type 4. Periodontal types are described as follows: Type 1:Normal; Type 2: Gingivitis; Type 3: Moderate to severe bone loss; and Type 4: Deep pockets and severe bone loss.
>
> Correctional Managed Health Care Policy E-36.6 establishes that the detection, diagnosis, and treatment of periodontal disease and maintenance of periodontal health are available to offenders based on classification of periodontal type, priority of need, and eligibility of care. Correctional Managed Health Care Policy 36.8 establishes that offenders requesting routine dental care, who are eligible by length of incarceration (at least twelve months), and demonstrate acceptable oral hygiene, will be scheduled for a dental comprehensive treatment plan. Correctional Managed Health Care Policy E-36.1 establishes that offenders' emergent/urgent, interceptive, and rehabilitative needs will be treated as clinically indicated within designated time frames. There are three levels of dental treatment: Level 1 (Emergency/Urgent); Level 2 (Interceptive); and Level 3 (Rehabilitative).
>
> Under the current E-36.1 policy, offenders who require routine dental care may fall under Level 3. As mentioned above, after twelve months of incarceration, Level 3 offenders requesting care are eligible for treatment of conditions with this Level 3 designation, with the demonstration and maintenance of acceptable oral hygiene. An offender who has not achieved acceptable oral self-care may request another plaque index re-evaluation, which must be provided within fourteen calendar days of the sick call request. Offenders are to receive further counseling and demonstration in oral hygiene techniques at the time of the plaque index appointment. Offenders with a treatment plan for conditions at this Level 3 designation will be seen for definitive care at least once every ninety calendar days after a comprehensive treatment plan is established.
>
> Level of dental care need can only be assigned by the treating dentist and is based on offender needs. Offenders' periodontal maintenance appointments are to be scheduled separately from routine care. It is up to the treating dentist to decide when and how often periodontal maintenance is to be provided. Missed appointments by offenders may result in being removed from the periodontal program. In any case, an offender may submit a sick call request under Correctional Managed Health Care Policy E-37.1.
>
> Whether Mr. Calton was in a periodontal program based on his periodontal type, designated under Level 3 or any other level of care, and/or under a comprehensive treatment plan, Mr. Calton's EHR indicates that his periodontal treatment, no-shows to his dental appointments, and subsequent teeth extractions conformed to Correctional Managed Health Care policies. As such, it appears that all relevant policies have been followed and Mr. Calton's treatment is within compliance.

(Doc. #56-3, pp. 3-4.).

### Plaintiff's Response

As indicated above, Plaintiff filed a Response to the *Martinez* Report. He states that instead of the delay he experienced in receiving care, his condition warranted expedited care. Plaintiff states that although Defendant Ross ordered on June 30, 2016, that Plaintiff receive a scaling and root planing procedure, the procedure was not performed within 90 days as provided for in the applicable policy. Plaintiff states the during the delay, some of the teeth that were then restorable and repairable became non-restorable and beyond repair. This resulted in a determination that the teeth should be extracted.

Plaintiff notes that in their affidavits, Drs. Horton and Hirsch reference him sometimes missing appointments or refusing treatment. Plaintiff states any appointments he may have missed were for routine care for tooth pain and that, as periodontal maintenance appointments are to be scheduled separately from routine care, any missed appointments had no effect on his periodontal treatment. Plaintiff acknowledges that on November 24, 2015, he refused an exam for sensitivity. He states he refused treatment because he has already been treated for this issue. Plaintiff admits he also refused treatment on November 22, 2017. However, he asserts this treatment concerned dentures and was not related to his periodontal care.

### Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine dispute as to any material fact and [a party] is entitled to judgment was a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the [other] party." *Anderson*, 477 U.S. at 248.

Analysis

*Deliberate Indifference to Serious Medical Needs*

To establish a violation of the Eighth Amendment to the Constitution based on the denial of medical care, a prisoner must show a defendant was deliberately indifferent to the prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). A defendant is deliberately indifferent to serious medical needs only if he knows an inmate faces a substantial risk of serious harm and disregards the risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994). Negligence or neglect does not rise to the level of a constitutional violation. *Hall v. Thomas*, 190 F.3d 693, 697 (5th Cir. 1999). In *Domino v. Tex. Dep't of Crim. Just.*, the United States Court of Appeals for the Fifth Circuit described the deliberate indifference standard as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a clam for deliberate indifference. Rather, the plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for any serious medical needs.

239 F.3d 752, 756 (5th Cir. 2001).

*Application*

In his Response to the *Martinez* Report, Plaintiff emphasizes the delay he experienced after a scaling and deep planing of the roots was ordered on June 30, 2016, as well as the determination on April 9, 2018, that this procedure should not be performed. He asserts the delay caused him to lost six teeth that were not considered non-restorable at the time the procedure was ordered, and caused him to be in severe pain for more than 20 months. Plaintiff also faults certain of the Defendants for failing to prescribe antibiotics and failing to arrange for his treatment to be expedited because of his severe pain.

The delay Plaintiff experienced was too long and difficult to understand. Intentionally delaying access to treatment that has been prescribed can constitute deliberate indifference. *Estelle*. 429 U.S. at 104-05. However, the negligent failure to schedule treatment does not amount to

deliberate indifference. *Thomas v. Carter*, 593 F. App'x 338, 344 (5th Cir. 2014); *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999).

Scaling and deep planing of the roots was prescribed for Plaintiff on June 30, 2016. He was subsequently seen by dental personnel on at least five occasions. He does not state he complained about his delay in receiving this procedure during any of these appointments. Plaintiff does state that on October 25, 2017, he filed a request asking when he would be scheduled for the procedure. He received a response stating he was scheduled for the procedure. There is no indication this statement was not true.

Plaintiff's allegations fail to show any of the Defendants were aware of the substantial delay he experienced. As a result, it cannot be concluded they were aware the delay was subjecting him to a substantial risk of serious harm. Perhaps Defendant Tucker, who ordered the procedure, should have followed-up to see if his order had been carried out. Or perhaps one of the other Defendants should have checked to see if Plaintiff had been scheduled for the procedure. However, while the failure to follow-up to see if orders have been carried out might constitute negligence, it does not constitute deliberate indifference. *Stewart,* 174 F.3d at 534.

Plaintiff also complains about Defendant Tucker's eventual determination that he should not receive a scaling and deep planing of the roots. Defendant Tucker made this determination after an additional full mouth periodontal probing and charting had been performed. Defendant Tucker was therefore relying on additional data when he concluded that the procedure was no longer indicated. Plaintiff disagrees with this conclusion and believes the procedure should have been performed. However, disagreement with a medical diagnosis or treatment does not state a claim for deliberate indifference to serious medical needs. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

In addition, Plaintiff asserts he should have received antibiotics and that his pain should have been treated more aggressively. There is no indication any antibiotics were prescribed for Plaintiff. However, as described above, Plaintiff was examined by at least four dentists. Presumably each

dentist determined antibiotics were not appropriate under the circumstances. There is no indication any dentist believed Plaintiff needed antibiotics and intentionally chose not to prescribe them.

With respect to Plaintiff's severe pain, his allegations show teeth were extracted in order to alleviate his pain. In addition, pain medication was prescribed at different times. Understandably, Plaintiff would argue that stronger medication should have been given. However, Plaintiff's complaints of severe pain were not ignored. The treatment he received demonstrates that the Defendants did not evince a wanton disregard for his serious medical needs.

Finally, Plaintiff complains that the policy for treating periodontal disease is inadequate. However, the affidavit submitted by Defendant Hirsch shows that policies are in place for the treatment of periodontal disease. It is not clear that the policy was followed in Plaintiff's case. However, the policies described by Defendant Hirsch prevent the conclusion that deliberate indifference was shown by the failure to have policies to treat inmates with this disease.

The treatment Plaintiff received does not appear to have been as good as it should have been. However, Plaintiff's pleadings and medical records show that the deficiencies were caused by, at most, negligence rather than deliberate indifference. It is regrettable that Plaintiff did not receive better treatment. But there is no genuine dispute of material fact as to whether the Defendants were deliberately indifferent.

## Recommendation

This lawsuit should be dismissed pursuant to Federal Rule of Civil Procedure 56.

## Objections

Objections must be (1) specific, (2) in writing, and (3) served and filed within 14 days after being served with a copy of this report. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(b) and 72(b).

A party's failure to object bars that party from (1) entitlement to *de novo* review by a district judge of proposed findings and recommendations, *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error, of unobjected-to factual

findings and legal conclusions accepted by the district court, *Douglass v. United Serv. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (*en banc*).

**SIGNED this the 14th day of June, 2022.**

_____
Christine L Stetson
UNITED STATES MAGISTRATE JUDGE